IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| AMY RAMIREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:12-CV-0262 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION
TO AFFIRM DECISION OF THE COMMISSIONER**

Plaintiff AMY RAMIREZ brings this cause of action pursuant to 42 U.S.C. § 405(g),

seeking review of a final decision of defendant CAROLYN W. COLVIN, Acting Commissioner of

Social Security (Commissioner), denying plaintiff's application for disability insurance benefits

(DIB).  Both parties have filed briefs in this cause.  For the reasons set out herein, the undersigned

United States Magistrate Judge recommends the Commissioner's decision finding plaintiff not

disabled and not entitled to benefits be AFFIRMED.

I.
THE RECORD

On March 29, 2011, plaintiff filed an application for DIB alleging she became unable to

work because of a disabling condition.  Tr. 113-16.  Plaintiff alleged her ability to work is limited

by her mental condition of bipolar disorder and depression, and that she stopped working on

February 17, 2011 when she became disabled because of these conditions.  Tr. 135.  In her

application for benefits, plaintiff alleged her conditions limit her ability to work because she gets "very frustrated easily," "can't get along with others," cannot remember things or concentrate, and her medication (prescribed February 7, 2011) causes drowsiness, disorientation, and sometimes headaches. Tr. 158; 165. Plaintiff stated she was seeing a psychiatrist for treatment of her mental condition because she "was very moody and things [she] was doing weren't right." Tr. 138. Plaintiff described her daily activities of waking up between 11:00 a.m. and noon, taking a shower, sitting in her room until she picked children up from school, deciding what to make for dinner around 6:00 p.m., then taking her medications and going to sleep between 11:00 p.m. and midnight. Tr. 159. Plaintiff acknowledged she took care of her husband, four children, and a dog, cooks and does laundry (although her husband helps do most of the cooking and children clean the house), grocery shops for short periods, watches some TV in the day time or at night, and drives to pick children up from school. Plaintiff acknowledged her mental condition does not cause problems with her personal care or cause other physical limitations. Plaintiff averred her mental condition prevents her from being around others, makes it very hard to fall asleep and to wake up, and restricts her reading. Plaintiff stated her mental condition affects her memory, completing tasks, concentration, understanding, ability to follow instructions, and getting along with others. Tr. 163. Plaintiff reported she does not like authority figures, had a relationship with a co-worker that caused conflict in her marriage and at work, that stress causes her anxiety, that she is impatient and dislikes change, and that she is uncomfortable around and cannot tolerate other people. Tr. 164. Plaintiff reported she completed her GED, and identified past work as a bank teller, receptionist, warehouse worker, funeral home worker, and yard maintenance worker. Tr. 135-36; 142-46; 152-56.

The record contained treatment notes from plaintiff's treating psychiatrist, Dr. Nguyen, indicating a February 7, 2011 diagnosis of "bipolar disorder, mixed," a GAF of 60, treatment by

medication, and four (4) sessions between February 7, 2011 and April 4, 2011, and one session each in June 2011, October 2011, January 2012, and March 2012.  Tr. 205-09; 246; 252-56.  The record also contained plaintiff's hospital records from May 2, 2011 to May 5, 2011 reflecting an admission and a diagnosis of major depression with suicidal ideation and bipolar disorder.  Tr. 211-20.  The discharge report noted plaintiff had experienced stress over the last few years and had been feeling increasingly depressed for two weeks prior to admission, with low energy and motivation.  Tr. 217.  The report indicated plaintiff's difficulty sleeping appeared to be resolved and, overall, the depression had lifted and plaintiff was doing well.  Discharge diagnoses were "bipolar II disorder,[1] most recent episode depressed" and a GAF of 50 to 60.

Also in the record was a May 17, 2011 consultative examination for a disability evaluation due to bipolar discorder conducted by Melissa Couch, a licensed clinical psychologist.  Tr. 221-25.  Couch noted plaintiff was appropriately groomed for the examination, walked and moved fluidly, was cooperative, maintained good eye contact, was clear in her speech, exhibited logical thought processes and showed no indication of psychosis.  Tr. 221.  Plaintiff reported her mood was "down; guilty" but her affect was appropriate, her attention was adequate and her consciousness was alert.  In describing her history, plaintiff denied any sexual abuse as a child, and reported she was fired from her job as a bank teller because she stole money from an account and was fired from the meat packing plant because she was having a sexual affair with a co-worker.  Plaintiff reported mood swings, from depression to mania, beginning in high school.  Tr. 222.  Plaintiff advised she was able to perform all grooming and personal hygiene, could cook, clean and perform household

---

[1]Bipolar II is similar to bipolar I disorder, with moods cycling between high and low over time.  In bipolar II disorder, however, the "up" moods never reach full-on mania, resulting instead in less-intense elevated moods.  Most people with bipolar II disorder also suffer from episodes of depression.  *WebMD*, http://www.webmd.com/bipolar-disorder/guide/bipolar-2-disorder (January 2014).

chores but rarely did, and generally was unrestricted in other abilities related to daily living including grocery shopping and caring for children.  Plaintiff reported sleeping until mid- morning, taking a shower, and then staying in her room most of the day because she had no energy or motivation.  Plaintiff reported situations indicating an impaired ability to socialize and interact with individuals in positions of authority, poor judgment related to social interaction, and tumultuous relationships with her husband and children.  Tr. 223.  Plaintiff reported her interpersonal interactions had improved somewhat since she began taking medication, but that she still felt paralyzed by "guilt" and "feeling down."

Plaintiff reported situations which indicated her ability to complete tasks in a timely fashion is impaired by her mental status, depending on if she is experiencing a manic or depressive phase. Couch indicated plaintiff reported two recent job terminations "due to mental health problems,"  but those two jobs appear to be the jobs plaintiff mentioned earlier that resulted in termination due to misconduct.  Noting plaintiff's recent hospitalization due to depression, Couch indicated plaintiff's ability "to manage stress both at home and at work is *significantly mildly* impaired by her mood swings."  Tr. 223-24 (emphasis added).

Couch noted plaintiff reported symptoms consistent with bipolar disorder, including periods of depression and mania, but denied problems consistent with an anxiety disorder as well as problems with her memory.  Plaintiff was able to perform all current memory recall drills and simple calculations.  Tr. 224.  Upon examination, Couch found plaintiff was oriented x 4, her statements were logical and goal-oriented and did not show any indication of psychotic thought content or process.  Couch found plaintiff's remote memory appeared adequate, her overall fund of information was good, her concentration was good, and she was able to attend appropriately during the evaluation.  Couch found plaintiff's capacity for abstract reasoning was good, as was her social

judgment, and that her insight appeared fairly good at the time of the examination.  Even so, Couch determined that during the interview and mental status examination, plaintiff "demonstrated and endorsed symptoms of bipolar disorder," noting her descriptions of mood swings from depression to mania and reports of rage episodes.  Tr. 224-25.  Couch's diagnostic impression was bipolar disorder with a GAF of 50.  Tr. 225.  Couch opined that plaintiff's prognosis was guarded, as bipolar disorder is a chronic and cyclic mental illness, noting plaintiff would continue to experience periods of decompensation.  Noting plaintiff's report that treatment resulted in some improvement in her thinking and interpersonal interactions, Couch opined plaintiff's mental status was likely to improve somewhat with continued treatment but noted she would likely continue to experience mood swings and significant symptoms of bipolar disorder despite treatment.  In her "capacity" evaluation, Couch found plaintiff's:

1.  Ability to understand, recall and follow simple instructions was *good*;

2.  Concentration and ability to persist and complete tasks in a timely fashion was *slightly impaired*;

3.  Persistence was *fair*;

4.  Ability to relate to peers, co-workers and supervisors was *poor*;

5.  Ability to cope with pressures and stressors such as those found in typical work settings was *poor*;

6.  Ability to work with objects was *good*;

7.  Ability to perform complex functions was *fair*;

8.  Ability to interact with the general public was *poor*;

9.  Ability to adapt to change was *fair*;

10.  Ability to meet deadline and production quotas was *impaired*;

11.  Ability to read information and communicate via speech/writing was *good*;

12.     Ability to problem-solve and make decisions was *fair*;

13.     Ability to manage funds was *adequate*.

On May 26, 2011, a state agency physician completed a Psychiatric Review Technique form assessing plaintiff's mental capabilities from February 17, 2011, plaintiff's onset date, to May 25, 2011. Tr. 227-40. The physician referenced plaintiff's visits to Dr. Nguyen, her treating psychiatrist, her diagnosis, and her treatment by medication. The physician also considered Couch's May 2011 consultative exam, noting her determinations in detail. The physician determined plaintiff had a medically determinable impairment of bipolar disorder with only mild or moderate degrees of functional limitations, with no episodes of extended duration-decompensation, and that the record evidence did not establish the presence of the "C" criteria.[2] Tr. 237. The physician noted plaintiff's Activities of Daily Living (ADLs) of "drives, shops in stores, does laundry" and found plaintiff's ADLs were "intact and functional." Tr. 239. The physician further noted plaintiff does have a residual diagnosis of depression but found it was "not of sufficient severity to compromise [her] ability to work." The state agency physician concluded plaintiff's allegations were partially supported.

In a Mental Residual Functional Capacity Assessment completed the same day, the state agency physician found plaintiff was *moderately* limited in various areas of social interaction (specifically interacting with the public, supervisors and coworkers), sustained concentration and persistence (not being distracted by others and completing a workday without interruptions from psychological symptoms), and adaptation (making plans independently), but not significantly limited in other aspects. Tr. 241-44. As plaintiff's functional capacity assessment, however, the

---

[2] Additional impairment-related functional limitaion criteria assessed only if the "B" criteria are not satisfied.

physician stated:  "Claimant is able to understand, remember, and carry out detailed but not complex instructions, make decisions, concentrate for extended periods, interact with others, and respond to changes."  Tr. 243.  Based upon review of plaintiff's medical documentation, the state agency physician diagnosed plaintiff with "affective/mood disorders" and found plaintiff not disabled.  Tr. 59.

On May 31, 2011, the Social Security Administration (SSA) determined plaintiff's condition was not severe enough to keep her from working and denied plaintiff disability benefits.  The SSA noted plaintiff claimed disability due to bipolar disorder but found that although she had some limitations, her daily activities were not significantly affected, her ability to perform basic work activities was not as limited as she indicated and, based on her description of her past relevant work (PRW) as a receptionist, she had the ability to perform this work as it is ordinarily performed in the national economy.  Tr. 61-65.

In a June 22, 2011 Disability Report, plaintiff noted she was admitted to a psychiatric hospital for four (4) days in May 2011, was treated for bipolar disorder, depression, anxiety and suicidal thoughts, and received additional medications.  Tr. 169-72.  Plaintiff reported her daily activities are affected by her mental condition in the following ways:  loss of interest in personal hygiene, sleeping most of the day, increased irritability, and an inability to be around strangers.  Tr. 173-74.  In a September 20, 2011 Function Report, plaintiff reported she sleeps all day and most of the night, cannot get out of bed, stays in bed all day to the extent she can, does not like to see other people, is very depressed, angry and sad, neglects her personal care, cannot do chores, does not go outside because there is too much noise, gets very emotional and quiet around others, and needs to be reminded to do things.  Tr. 181-86.  Plaintiff also reported her ability to lift, squat, bend, walk and talk was affected because her "body hurts."  Tr. 186.

On September 29, 2011, upon reconsideration, a different state agency non-examining physician reviewed plaintiff's medical evidence and again diagnosed plaintiff with "affective/mood disorders" and again found plaintiff not disabled.  Tr. 60; 247; 249.  On September 30, 2011, the Social Security Administration found plaintiff's condition was not severe enough to keep her from working and denied plaintiff disability benefits.  The SSA noted the medical information showed plaintiff's conditions were being treated and that as long as she continued to follow her doctor's orders, her conditions should remain under control.  The SSA also found plaintiff's conditions had not seriously affected her ability to understand, remember, or be around other people.  The SSA determined the evidence did not show plaintiff's ability to perform basic work activities was as limited as she indicated, and that based on her description of PRW as a receptionist, she had the ability to perform this work as it is ordinarily performed in the national economy.  Tr.  70-73.

Plaintiff requested an administrative hearing and, on March 22, 2012, an administrative hearing was held before an Administrative Law Judge (ALJ).  Tr. 29-48.  At the time of the hearing plaintiff was 38-years-old.

At the hearing, in addressing preliminary matters, plaintiff's counsel argued Couch's use of the term "poor" in her "capacity" evaluation was equivalent to a finding of a *marked* limitation in maintaining social function or in social interaction.  Counsel, however, acknowledged "poor" was not a program term and requested permission to clarify Couch's "poor" finding through plaintiff's treating psychiatrist, Dr. Nguyen, or through interrogatories to Couch.  Tr. 32.  The record, however, was not supplemented with such clarification.

At the hearing, plaintiff testified she had received a GED, and had last worked in February 2011 recording temperature data at a meat packing plant.  Tr. 33-34.  Plaintiff averred she had not worked since then because of an inability to stay awake during the day and from anxiety caused by

being around people.  Tr. 34.  Plaintiff testified she had been seeing a psychiatrist since January 2011 and had been taking Depakote, Geodon, Ativan and Celexa.  Tr. 35.  Plaintiff opined the medications helped her not be "as angry anymore" and prevented her from doing "things without thinking of the consequences."  Tr. 36.  Plaintiff averred her anger originated from her daughter being molested by her father-in-law around the time she stopped working, explaining her own history of abuse made the situation worse.[3]  Tr. 36-37.

Plaintiff described her daily routine of going to bed around 9:00 p.m., but not falling asleep until 1:00 a.m., and then sleeping until 1:00 p.m. the next day.  Tr. 37.  Plaintiff explained there are some nights where she does not sleep, but that most nights she does sleep.  Tr. 42.  Plaintiff stated she retreats to the bathroom for privacy and sits in front of an electric heater until she leaves to pick up her 10-year-old nephew from school every weekday.  Tr. 37-40.  Plaintiff advised she does not go into her nephew's school, go anywhere alone, attend extracurricular activities, or communicate with anyone during the day.  Tr. 40-41.  Plaintiff stated her husband accompanies her to doctor appointments, and that she will accompany him when he does the grocery shopping but will become agitated if the trips are long.  Tr. 41.  Plaintiff explained her three (3) children or nephew (ages 10 - 19) do the household chores and her husband or daughter cook the evening meal, bringing it to plaintiff in the bathroom.  Tr. 39.  Plaintiff advised she is able to do the household chores, but she doesn't, instead opting to sit in her bathroom or on her bed.

Plaintiff averred she has trouble concentrating, argued with superiors at her last job when criticized about her performance, and was terminated from that employment "because of conflict with another employee."  Tr. 38.  Plaintiff testified her treating psychiatrist "doesn't think [she] can

---

[3]Plaintiff reported to Couch she had been subjected to verbal and physical abuse as a child but not sexual abuse.

work," would be on her medications for some twenty years, and would not have any improvement

before then.  Tr. 41.  Plaintiff opined she could not do solitary night shift work because she takes

her pills at night and "they usually help [her] go to sleep."  Tr. 41-42.  Plaintiff opined she could not

perform a solitary day job because "[j]ust getting out of the house is a problem," explaining her

daily trips to pick her nephew up from school are limited to approximately 10 minutes.  Tr. 42.  She

advised there are often days she does not take a shower, explaining it is not that she forgets to but

that she just does not do it.  Tr. 43.  Plaintiff testified she does not go out to dinner, does not have

any other family or friends to visit, does not have internet access at home, and does not read or

watch television.  Plaintiff opined she sits in her bathroom in front of the heater approximately 70%

of her waking hours.

A vocational expert (VE) testified at the hearing that plaintiff's past relevant work (PRW) as

a bank teller was light, skilled work; as a funeral attendant was medium, semi-skilled work; and as a

warehouse checker (thermometer reader) was light, unskilled work.  Tr. 44.  When the ALJ posed a

hypothetical with no exertional restrictions, but limited such an employee to (1) simple job tasks,

and (2) only occasional public contact and employee interaction (other than with another co-

worker), the VE testified such an employee could perform plaintiff's PRW as a warehouse checker

(thermometer reader).  Tr. 45.  The VE further testified there were other jobs like maid and

janitorial type positions, laundry worker positions, and hand packing-type positions such an

employee could perform based on the restrictions of the hypothetical.  When the ALJ posed the

same hypothetical but added a restriction of (3) difficulty maintaining attention and concentration

for a 2-hour amount of time, the VE testified such an employee could still perform those types of

jobs because she would typically get a break every two hours.  When the ALJ posed the same

hypothetical but added that such an employee (4) would take unscheduled naps, averaging more

than two a month, the VE testified there would not be any jobs such an employee could perform. Tr. 45-46. When the ALJ posed the same hypothetical but added that such an employee is (5) a "distraction on an occasional basis dealing with co-workers, supervisors or the general public," the VE explained that if the distraction was one-third of the work time or more, there would not be any jobs such an employee could perform. Tr. 46. Upon examination by plaintiff's attorney, the VE acknowledged that an employee (6) who argues with a co-worker or a supervisor could still perform the above jobs if it is just a brief argument and did not affect productivity, but that if the arguing injured someone, was repeated or affected productivity, it would not be tolerated.

On May 22, 2012, "[a]fter careful consideration of all the evidence," the ALJ rendered an unfavorable decision finding plaintiff not disabled and not under a disability as defined by the Social Security Act at any time from February 17, 2011 through the date of the decision. Tr. 17-25. The ALJ found plaintiff had not engaged in substantial gainful activity since her alleged onset date. Tr. 19. The ALJ determined plaintiff has the following severe impairments: major depressive disorder, bipolar disorder, and history of polysubstance abuse.[4] Tr. 19. The ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."[5] Tr. 20-21. The ALJ found that plaintiff retained the residual functional capacity (RFC)[6] to perform a full range of work at all exertional levels, with the following nonexertional limitations: simple job tasks, and only occasional contact with the public and co-

---

[4]The ALJ found plaintiff's hypothyroidism impairment was not severe. Tr. 20.

[5]The ALJ specifically considered Listing 12.04 (affective disorders) for plaintiff's mental impairments, finding plaintiff's impairments did not satisfy the "paragraph B" criteria requiring marked restrictions, or the "paragraph C" criteria requiring repeated episodes of decompensation. Tr. 20.

[6]Residual functional capacity is what the claimant can still do despite the claimant's limitations. 20 C.F.R. § 220.120(a)

workers.  Tr. 21.  Based upon his RFC finding, the ALJ found plaintiff is able to perform her past relevant work as a warehouse checker as it is actually and generally performed.  Tr. 23.

In addition to being able to perform her past work, the ALJ, utilizing the vocational expert's testimony, determined that considering plaintiff's RFC, age, education, and past relevant work experience, plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the regional and national economies, *viz.*, medium unskilled work in maid and janitorial positions, laundry worker positions, and hand packing positions.  Tr. 24.  Using the Medical-Vocational Rules only as a framework, the ALJ also determined a finding of "not disabled" was appropriate.  The ALJ concluded plaintiff was not under a disability at any time from February 17, 2011, the alleged onset date, through May 22, 2012, the date of the decision.  Tr. 24.

On October 24, 2012, the Appeals Council denied plaintiff's request for review rendering the ALJ's determination that plaintiff was not under a disability during the relevant time period the final decision of the Commissioner.  (Tr. 1-4).  Plaintiff now seeks judicial review of the denial of benefits pursuant to 42 U.S.C. § 405(g).

II.
STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to determining whether substantial evidence exists in the record, considered as a whole, to support the Commissioner's factual findings and whether any errors of law were made.  *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989).  To determine whether substantial evidence of disability exists, four elements of proof must be weighed:  (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history.  *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)

(citing *DePaepe v. Richardson*, 464 F.2d 92, 94(5th Cir. 1972)).  If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding.  *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980). Conflicts in the evidence are to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence.  *Hames v. Heckler*, 707 F.2d at 164.  Stated differently, the level of review is not *de novo*.  The fact that the ALJ <u>could</u> have found plaintiff to be disabled is not the issue.  The ALJ did not do this, and the case comes to federal court with the issue being limited to whether there was substantial evidence to support the ALJ decision.

### III.
### ISSUE

Plaintiff argues the ALJ erred in determining plaintiff's RFC and that the decision to deny benefits is not supported by substantial evidence.  Specifically, plaintiff contends the ALJ did not adequately explain the failure to include additional non-exertional limitations in the plaintiff's RFC, and argues this failure constituted reversible error because the limitations omitted were part of the consultative examiner's findings.

Defendant did not submit a meaningful response to plaintiff's argument.  Instead, defendant misconstrued plaintiff's brief and even when plaintiff pointed this out in her reply brief, defendant failed to respond.  The defendant Commissioner is instructed she should adequately respond to and address the claims made by plaintiffs in Social Security appeals.  The Court will not, however, reverse the case solely because of defendant's failure to respond but will address the merits of plaintiff's argument.

IV.

MERITS

ALJ's RFC Determination

The ALJ determined plaintiff had severe mental impairments of:  (1) major depressive

disorder, (2) bipolar disorder, and (3) history of polysubstance abuse.  Tr. 19.  The ALJ found the

severity of plaintiff's mental impairments, considered singly and in combination, did not medically

equal the criteria of Listing 12.04.  In making those findings, the ALJ evaluated plaintiff's mental

impairments under the Part "B" criteria used to rate the severity of mental impairments at Steps 2

and 3 of the sequential evaluation process.  Tr. 20.  To satisfy Part "B" criteria, mental impairments

must result in at least two of the following:  *marked* restriction of activities of daily living (ADLs);

*marked* difficulties in maintaining social functioning; *marked* difficulties in maintaining

concentration, persistence, or pace; or *repeated* episodes of decompensation, each *of extended

duration*.  The ALJ found plaintiff's mental impairments caused *moderate* restriction of ADLs,

noting plaintiff reported in her April 27, 2011 Function Report she was able to care for her personal

needs, prepare small meals, drive, shop in stores, and count change, and that she related she was

able to pick up her children from school each day.  The ALJ found plaintiff had *moderate*

difficulties in social functioning in that she can have only occasional contact with the public and co-

workers.  The ALJ found plaintiff had *moderate* difficulties in the area of concentration, persistence

or pace, in that she can only perform simple job tasks.  The ALJ found plaintiff had experienced 1-2

episodes of decompensation, each of *extended duration*.  Based on these findings, the ALJ

determined plaintiff's mental impairments did not satisfy the Part "B" criteria.[7]  The ALJ pointed

---

[7]The ALJ also considered plaintiff's mental impairments under Part "C" finding the evidence failed to establish the criteria
were satisfied because plaintiff had not had repeated episodes of decompensation or a residual disease process that would cause
her to decompensate, nor an inability to function outside a highly supportive living arrangement.  Tr. 20.

out that the limitations he identified in his analysis of the Part "B" criteria were <u>not</u> part of the residual functional capacity (RFC) assessment to be made at Step 4, but were only used to rate the severity of plaintiff's mental impairments at Steps 2 and 3.

At Step 4 the ALJ found plaintiff had the RFC to perform (1) a full range of work, (2) at all exertional levels of work, (3) limited to simple job tasks, with (4) only occasional contact with the public and co-workers. Tr. 21. The ALJ found plaintiff retained the ability to perform her RFC for a sustained basis (a 40-hour work week), for an indefinite period of time. The ALJ noted that in making this RFC finding, he considered the entire record, including all of plaintiff's symptoms, the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence, opinion evidence, and other evidence.

The administrative record contains conflicting evidence and statements by plaintiff regarding the severity of her mental illness and her ability to perform various daily activities. The conflicts are primarily an increase in the degree of plaintiff's limitations. This could have been because of a decline in plaintiff's mental health or could be the result of exaggeration as the case proceeded through the process. The ALJ resolved that issue when he concluded plaintiff's subjective complaints and allegations of the severity, frequency, and intensity of her symptoms were not fully credible. Tr. 22. The ALJ detailed the limited medical evidence, including treatment records and Couch's psychological consultative examination, giving "*great weight* to the opinion of Dr. Couch insofar as it [was] consistent with [plaintiff's] residual functional capacity." (emphasis added). "*Based on Dr. Couch's report*," the ALJ limited plaintiff "to simple tasks with only occasional public and co-worker interaction." (emphasis added)

The ALJ further noted that plaintiff had limited treatment for her mental health, that treatment records indicated only moderate symptoms, that plaintiff had reported in her SSA

submissions that she was capable of performing ADLs (caring for her personal needs, preparing small meals, driving, shopping in stores, counting change, picking children up from school daily), and that plaintiff had testified at the hearing that her primary problem was her "inability to deal with others," a limitation the ALJ noted he accounted for in the RFC.  Tr. 23.

The ALJ also noted he considered the state agency medical physician's Mental Residual Functional Capacity Assessment and weighed such "findings of fact" and "opinion" as a statement from a non-examining source.  Acknowledging the evidence did not "entirely support [plaintiff's] extensive complaints," the ALJ disagreed with and did not adopt the state agency physician's functional assessment that plaintiff could "carry out detailed but not complex instructions" and could "interact with others," finding instead that "some level of functional loss could reasonably be expected" as a result of plaintiff's impairments and that plaintiff was "more appropriately limited to simple tasks with [only] occasional public and co-worker interactions."  Accordingly, the ALJ granted "*little evidentiary weight*" to the State agency physician's "opinion" in "determining [plaintiff's] mental functional abilities."  (emphasis added).  Lastly, the ALJ specifically noted there was no medical opinion from any medical source indicating plaintiff is entirely incapable of working.

Findings of the Consultative Psychologist

Plaintiff argues the ALJ committed legal error in determining plaintiff's RFC because the RFC assessment is not supported by substantial evidence.  Plaintiff contends Melissa Couch's consultative report set out "13 separate opinions" about plaintiff's "capacity," *see* page 5-6, *supra*, and argues that despite giving "great weight" to the opinion of Couch "insofar as it [was] consistent with [plaintiff's] residual functional capacity," the ALJ included "only two" of the limitations in his

RFC finding (the ALJ indicated that, "[b]ased on [Couch's] report," plaintiff was limited (1) "to

simple tasks," and (2) "with only occasional public and co-worker interaction.").  Plaintiff contends

the ALJ selectively and improperly "plucked" or "picked and chose" only the evidence from the

record that supported his RFC determination.  Plaintiff contends the ALJ's failure to include, in his

RFC determination, the remainder of Couch's opinions concerning plaintiff's work-related

"capacity," <u>without explaining or discussing why such limitations were not included in the RFC</u>,

was legal error and an improper evaluation of plaintiff's RFC, thereby rendering the RFC

determination unsupported by substantial evidence.  Acknowledging an ALJ need not articulate his

reasons for rejecting every piece of evidence but must at least minimally discuss any evidence that

contradicts his findings, plaintiff contends the ALJ erred in failing to articulate, at a minimal level,

his reasons for not including the remainder of Couch's findings.  Plaintiff concludes that if the ALJ

had adopted all the "non-program term" limitations in Couch's opinion, such findings would have

precluded work based on the RFC found by the ALJ and plaintiff would have been found disabled.

In her reply brief, plaintiff initially states defendant misconstrued her ground as an argument

that the ALJ "had to adopt all the limitations in Dr. Couch's medical source statement" because he

granted the consultative opinion great weight.  *Plaintiff's Reply Brief*, at 1.  Plaintiff then clarifies

the issue, asserting her claim is one of legal error in that "the ALJ rejected limitations from an

examining source without explanation when formulating his residual functional capacity" and that

her "central argument was the ALJ's lack of discussion concerning opinion evidence that

contradicted his RFC finding," arguing the ALJ "had to explain why he rejected the parts he

omitted."

Case law instructs that an ALJ need not explain in his or her written determination all

evidence contained in the record.  *See McFadden v. Astrue*, 465 Fed. Appx. 557, 559 (7th Cir.

2012) ("an ALJ may not ignore entire lines of evidence contrary to the RFC determination but she need not discuss every piece of evidence in the record") (citing *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010)); *Kornecky v. Commissioner of Social Security*, 161 Fed. Appx. 496, 507-08 (6th Cir. 2006) (quoting *Loral Defense Systems-Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999) (holding an ALJ can consider evidence without directly addressing it); *NLRB v. Beverly Enterprises-Massachusetts*, 174 F.3d 13 (1st Cir. 1999) ("ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *NLRB v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 765 (2d Cir. 1996) (ALJ may resolve credibility disputes implicitly rather than explicitly where his "treatment of the evidence is supported by the record as a whole"); *Penalver v. Barnhart*, No. SA-04-CA-1107-RF, 2005 WL 2137900, at *6 (W.D. Tex. July 13, 2005) ("The ALJ may not have discussed all of the evidence in the record to the extent desired by Plaintiff, but the ALJ is only required to make clear the basis of his assessment-he need not discuss all supporting evidence or evidence rejected."); *Jefferson v. Barnhart*, 356 F. Supp. 2d 663, 675 (S.D. Tex. Mar. 12, 2004) ("in interpreting the evidence and developing the record, the ALJ need not discuss every piece of evidence").

In determining whether to reverse the administrative decision, this Court must consider whether the failure of the ALJ to more thoroughly discuss Couch's evaluation, if error, was reversible error or, instead, if it was merely harmless error.  Even if an ALJ committed error, "procedural perfection in administrative proceedings is not required.  This court will not vacate a judgment unless the substantial rights of a party have been affected."  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Plaintiff contends the ALJ, without explanation, accepted only two (2) of Couch's "13 listed limitations."  *Plaintiff's Brief*, at 2.  Review of Couch's capacity evaluation, however, shows that

the majority of the listed findings were of no significance and that eight (8) of the factors listed by Couch cannot be described as true limitations.

Finding No. 1 ("good" ability to understand, recall and follow simple instructions) was not a limitation, nor were findings No. 3 ("fair" persistence), No. 6 ("good" ability to work with objects), No. 7 ("fair" ability to perform complex functions), No. 9 ("fair" ability to adapt to change), No. 11 ("good" ability to read information and communicate via speech/writing), No. 12 ("fair" ability to problem-solve and make decisions) and No. 13 ("adequate" ability to manage funds).  None of these evaluations have been shown to have an appreciable limitation on plaintiff's RFC.

In addition to those eight (8) findings, two (2) other "limitations," *i.e.*, Finding No. 4 ("poor" ability to relate to peers, co-workers and supervisors) and Finding No. 8 ("poor" ability to interact with the general public) were accommodated by the non-exertional limitation of "only occasional contact with the public and co-workers."

That leaves only three (3) "limitations" which might arguably erode the RFC determination. Those are Finding No. 2 ("slightly impaired" ability to concentrate, persist and complete tasks in a timely fashion), Finding No. 5 ("poor" ability to cope with pressures and stressors in typical work settings), and Finding No. 10 ("impaired" ability to meet deadline and production quotas).  While there is no dispute that the better practice would have been for the ALJ to directly address these three (3) factors, the failure to do so is not reversible.  Since psychologist Couch classified plaintiff's "ability to concentrate, to persist, and to complete tasks" as a "slight" impairment (Finding No. 2), it would not have negatively affected the RFC.  In addition, the ALJ included a limitation in the RFC that plaintiff was limited to "simple job tasks."  Limiting an individual to simple job tasks, as opposed to detailed and/or complex tasks, could constitute an adequate

accommodation for an individual with a "poor" ability to cope with pressures and stressors (Finding No. 5), an "impaired" (albeit to an unknown degree) ability to meet deadline and production quotas (Finding No. 10), as well as the "slight" impairment to the ability to concentrate, persist and complete tasks (Finding No. 2).  There is additional support for the conclusion that the ALJ considered but rejected these last three (3) findings in that the ALJ specifically found plaintiff retained the ability to perform work on "a sustained basis," *i.e.*, for a 40-hour work week, for an indefinite period of time.  Evidentiary support exists for the determination that the ALJ considered whether any of Couch's findings would prevent full time employment.

There has been no showing any of plaintiff's limitations were *marked* or *extreme*.  While plaintiff's counsel contended, at the ALJ hearing, that Couch's "poor" evaluations constituted "marked" limitations, plaintiff failed to support that contention with any supplementation following the ALJ hearing.[8]  The ALJ's opinion is sufficient enough to find, under the limited review available on appeal from an adverse administrative agency finding, that no reversible error was committed.

The ALJ gave great weight to Couch's opinion but only *"insofar as it [was] consistent with the [plaintiff's] residual functional capacity*."  (emphasis added).  The ALJ stated he considered "the entire record" as he noted more than once in his decision, that he considered not only Couch's opinion, but also plaintiff's written statements submitted in support of her disability claim, the very limited treatment records from plaintiff's treating doctors, the medical findings and functional assessment/opinion of the state agency physician, and plaintiff's subjective oral testimony at the hearing (which the ALJ found not fully credible).  Considering the entire record and the overall

---

[8]The ALJ kept the record oepn after the hearing to permit counsel to address the issue.

findings of Couch, the undersigned can not find the ALJ "plucked" only that evidence which he deemed to be supportive of his RFC finding and completely disregarded other evidence that was contradictory to his RFC finding.

Plaintiff also argues the ALJ's RFC limitation of "only occasional contact" with the public and co-workers was error because it did not fully adopt Couch's rating of plaintiff's ability to relate to peers and co-workers and interact with the general public as "poor." To the extent plaintiff contends "poor" indicates a "marked" or substantial loss in the ability to perform work and that such finding is not remedied by the "only occasional" contact limitation, such contention is without merit. Plaintiff has not established the ALJ's limiting plaintiff to only "occasional" *contact* with others was insufficient to incorporate Couch's finding that plaintiff's ability to *relate to* or *interact with* others was "poor" or was legal error on any other ground. The ALJ's decision reflects he considered Couch's rating of plaintiff's ability to relate or interact with others as "poor" and included such finding in his RFC by limiting plaintiff to only occasional contact with the public and co-worker interaction. Stated differently, the ALJ found that <u>even with</u> her poor ability to relate to or interact with others, such did not prevent plaintiff from working at a job where she would have only occasional contact with other individuals at the work place. Plaintiff has not established reversible legal error.

Plaintiff also appears to argue the ALJ's finding that if plaintiff is limited to only occasional interaction or contact with co-workers, such limitation is, in itself, disabling (noting SSR 83-10 defines occasionally as "very little up to 1/3 of the time," meaning the ALJ found plaintiff could not interact with co-workers for 2/3s of the day). Plaintiff contends this amounts to a substantial loss in this ability which should have resulted in a finding of disabled. This limitation, however, was presented to the VE who found an RFC with only occasional contact with co-workers would not

eliminate plaintiff's PRW.  The VE finding and testimony provides the required evidentiary support for the RFC determination.

The ALJ also queried the VE about a claimant who has difficulty maintaining attention and concentration for a 2-hour amount of time and her ability to maintain employment.  Even though this limitation was not included in the RFC, the VE testified such a claimant could still perform plaintiff's PRW as well as other types of jobs.

Lastly, plaintiff references *Anderson v. Astrue*, 2011 WL 1641766 (N.D. Tex. 2011), a prior decision out of this Court.  While the *Anderson* case has similarities to this case, it is distinguishable.  Among other differences, the case involved inconsistent findings at Step 4 and Step 5 that were not harmless error.

The ALJ has the sole responsibility for determining a claimant's disability status.  The ALJ's decision reflects he considered and evaluated <u>all</u> of the medical evidence of record in addition to plaintiff's statements made during the application process and her subjective testimony at the hearing (which differed considerably from her previous statements).[9]  Moreover, the ALJ's RFC finding reflects he appropriately weighed the medical source opinions of record and properly resolved conflicts between the medical opinions.  The Court finds there are findings from a qualified medical source to support plaintiff's RFC.  The Court finds no error sufficient to reverse the ALJ's decision.  Plaintiff's ground should be denied.

V.

<u>RECOMMENDATION</u>

It is the recommendation of the undersigned United States Magistrate Judge to the United

---

[9]No third parties were called to testify as to their observations of the severity, frequency and intensity of plaintiff's symptoms, and the ALJ found plaintiff's allegations only partially credible.

States District Judge that the decision of the defendant Commissioner finding plaintiff AMY

RAMIREZ not disabled and not entitled to a period of benefits be AFFIRMED.

VI.

INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation

to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this  11th  day of March 2014.


_____

CLINTON E. AVERITTE

UNITED STATES MAGISTRATE JUDGE


**\* NOTICE OF RIGHT TO OBJECT \***

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1), *as recognized in ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).